

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------- X

THOMAS GEORGE                                        :          08 CV 275(ARR)(LB)
                                                     :
                    Plaintiff,                       :          NOT FOR PRINT OR
                                                     :          ELECTRONIC
      -against-                                      :          PUBLICATION
                                                     :
TJX COMPANIES, INC.                                  :          OPINION AND ORDER
                                                     :
                    Defendant.                       :
------------------------------------------------------------------- X

ROSS, United States District Judge:

      Plaintiff, Thomas George, proceeding <u>pro se</u>, claims that defendant, TJX Companies,

Inc., the operator of T.J. Maxx apparel and home fashion stores and plaintiff's former employer,

discriminated against him on the basis of his disability, in violation of the Americans with

Disabilities Act of 1990, 42 U.S.C. § 12111, et seq. ("ADA").  Specifically, plaintiff alleges that

TJX Companies failed to accommodate his disability, a fractured right arm, and terminated his

employment in October 2006 in violation of the ADA.

      The defendant has moved for summary judgment pursuant to Fed. R. Civ. P. 56(c) on the

grounds that plaintiff failed to make out prima facie cases of disability discrimination and failure

to accommodate.  Defendant further argues that plaintiff was terminated for legitimate non-

discriminatory reasons.  Plaintiff has responded in opposition.  For the reasons that follow, the

motion is granted and the action is dismissed.

I.    <u>Facts</u>

      The evidence in the record, viewed favorably to the plaintiff, would permit a jury to find

the following.

Plaintiff was employed as a full-time backroom associate at the T.J. Maxx store in New Hyde Park, New York from June 2004 to October 2006, when he was terminated.  He was assigned to the home goods department.  The backroom associate position entailed lifting, stacking, and processing approximately 400 to 450 boxes of merchandise a day.  After stacking the boxes, plaintiff was responsible for opening the boxes, unloading the merchandise, fixing price tags to the merchandise, and preparing the merchandise for the sales floor.

During the time that plaintiff worked at T.J. Maxx, he was also employed part-time by Pathmark, as a produce clerk, a job he began in February 2003.  As a produce clerk, plaintiff was primarily responsible for replenishing the fruits and vegetables on display in the store, a job requiring that he carry produce boxes weighing approximately 20 to 25 pounds from the back room to the store floor.  Plaintiff typically replenished produce items only once per shift. Plaintiff was also responsible for trimming and washing romaine lettuce, sweeping the back room, and cleaning tables.

On February 14, 2006, plaintiff was injured on the job at T.J. Maxx.  While walking through the store's parking lot toward the dumpster to throw away trash, plaintiff slipped on a sheet of ice and fractured a bone in his right arm.  A coworker called 911 and plaintiff was taken to North Shore University Hospital, escorted by his wife Sophia Thomas, who was also employed as a backroom associate at the New Hyde Park T.J. Maxx store.

Immediately after leaving the hospital, plaintiff returned to T.J. Maxx to provide the store manager, Thomas Keenan, with his discharge papers and medical report.  He was instructed by the store's assistant manager to file a workers' compensation claim, which he did.  In March 2006, plaintiff was awarded $23,098.14 by the New York State Workers' Compensation Board,

2

which found that plaintiff lost 25 percent use of his right arm and suffered from a "permanent partial disability."

Plaintiff took a medical leave of absence from his jobs at both T.J. Maxx and Pathmark following his accident, from February to April 2006. While on his two-month medical leave, plaintiff's arm was regularly examined by his treating physician, Dr. Paul J. Miller, or Miller's partner Dr. Donald Forman. Following each doctor's appointment, plaintiff delivered a note from his physician in-person to Keenan or an assistant manager at T.J. Maxx; he also provided the same physician notes to the Pathmark store manager. In total, plaintiff submitted five notes from his treating physician to T.J. Maxx's store managers. Each physician's note describes plaintiff's injury as a fracture of his humerus, his upper arm. The first three notes, dated February 15, February 22, and March 1, informed the defendant that plaintiff "is unable to work until he is re-examined" at his next scheduled appointment. Plaintiff's fourth note, dated March 17, informed the defendant that plaintiff may return to work on March 18, so long as he not lift over five pounds. Plaintiff's final physician's note, dated April 7, informed the defendant that plaintiff "may return to work on" April 10. At no point did plaintiff discuss with T.J. Maxx management when he would be able to return to work, the tasks he could perform with his fractured arm, or how he was feeling; he merely submitted the physician's notes following his doctor's appointments. (See George Dep. at 125.)

Soon after plaintiff submitted the April 7th physician's note to T.J. Maxx, an assistant store manager called plaintiff and assigned him to his prior work shifts. Plaintiff never informed that assistant manager or any management personnel that he could not perform his backroom position with his fractured arm and never requested a light duty position. (See George Dep. at

3

146, 170-71.) Plaintiff also resumed his part-time job at Pathmark, without restrictions or requests for accommodations, on or about April 10.

On July 13, 2006, about three months after he returned to work from his medical leave, plaintiff was told by his direct supervisor, backroom coordinator Nelson Monroid, "that Keenan said, if you cannot work hard with your broken arm, 'ask him to get out of the store.'" (George Dep. at 151.) Keenan had "passed the instruction" to Monroid, who delivered the message to plaintiff and confirmed to the plaintiff that Keenan in fact told him to deliver the message. (George Dep. at 151-52.) Plaintiff understood the message from Monroid to mean that Keenan had fired him, so plaintiff clocked out and walked out of the store. Plaintiff testified that, after speaking to Monroid, plaintiff confronted Keenan and said, "'The store, back room coordinator told me that, you passed the instruction to him that if I cannot work hard with my broken arm, get out of the building. Okay I am leaving now.' And I told him that, 'God will not forgive you,' and I get out and walk out." (George Dep. at 152.) Following this incident, plaintiff received a call from TJX Companies requesting that he return to work, and he resumed his backroom position a week later.

As a result of this July incident, plaintiff believed he would be terminated – that he would be again asked "to get out of the building" – if he requested an accommodation. (George Dep. at 170.) Plaintiff testified that "if I open my mouth, or if I come late, again the same thing. He will ask me to get out of the building." (George Dep. at 171.) That is why, when plaintiff resumed his position in mid-July, plaintiff never informed Keenan or an associate manager at T.J. Maxx that he was not ready to return to his backroom associate position or requested a light duty position, such as a cashier's position, until his arm healed. (George Dep. at 169-71.)  However,

4

plaintiff believed that T.J. Maxx should have offered him a light duty position. (George Dep. at 170-71.)

On the morning of October 26, 2006, plaintiff's wife, Sophia Thomas, got into a heated argument with another female backroom associate, Jeni, over hanging cashmere sweaters. Thomas and Jeni had a history of arguments throughout their employment. Plaintiff testified that "every single day it happens between she, Jeni and my wife. Nobody take any action." (George Dep. at 173.) At the conclusion of the argument, plaintiff and Thomas walked out of the store before completing their shifts. Plaintiff explained that Thomas "asked me that – she cannot work anymore here, because – I heard, she was yelling and shouting in front of me and my coordinator. And then I also thought no use of working here, because Tom Keenan is not settling it in any case." (George Dep. at 174.) According to Thomas, when she and the plaintiff returned home, she witnessed and overheard plaintiff's telephone conversation with the store's backroom manager advising the manager that he would not be returning to work. TJX Companies terminated plaintiff on that date for abandoning his job and resigning without notice.

Plaintiff's deposition testimony about his October 2006 job abandonment indicates that he may have walked out not only in solidarity with his wife, but also because of the way T.J. Maxx had treated him following his injury. Plaintiff testified, when asked about his job abandonment, that "I didn't commit any mistake, or I didn't commit any crime, me or my wife, because he [Keenan] does not like us, and he [Keenan] did not give me any change of position because of my serious injury. That was an on-the-job injury." (George Dep. at 176.) Plaintiff further testified that "I just walked out in order to . . . complain to the labor department." (George Dep. at 186.) Plaintiff elaborated on this testimony in his affidavit, in which he

5

explained that he walked off of the job "[i]n order to file complaint with NY State labor department." (George Aff. ¶ 14.)

Since his termination from T.J. Maxx, plaintiff has continued to work part-time at Pathmark as a produce clerk, and began a full-time cashier position at a 7-Eleven store in January 2007, a job he performs in addition to the produce clerk position.

Plaintiff asserts that after his accident, Keenan "wanted to get rid of me as he needed a [sic] able bodied man in order to perform the back room duties." (George Aff. ¶ 3.) Plaintiff asserts that Keenan "was waiting for an opportunity to fire me. That is why he passed the instruction on to the backroom supervisor" to terminate plaintiff. (George Aff. ¶ 11.)

Plaintiff testified that although he was still "totally disabled," on April 7 when he was examined by his physician, he felt pressured to request that his doctor clear him for work. (See George Dep. at 140.) According to plaintiff, after he submitted the March 17 physician's note to T.J. Maxx, he was informed by American Casualty Company, TJX Companies' insurance carrier, that he would no longer receive Workers' Compensation payments because there are light duty work opportunities at T.J. Maxx that he was qualified to perform. Plaintiff understood from the insurance carrier representative that he would be contacted by T.J. Maxx regarding a light duty assignment, however, plaintiff was never contacted by T.J. Maxx managers. Having been cut off from the Workers' Compensation payroll and needing to earn money to pay his bills, plaintiff requested a note from his physician stating that he could return to work without restrictions at his April doctor's appointment. (See George Dep. at 59, 61-62, 68, 140.)

The record also contains testimony by plaintiff that he believed he was mistreated because his first name is "Thomas," the same first name as the store manager. Plaintiff testified

6

that on Keenan's first day of work as manager of the New Hyde Park T.J. Maxx store, after

plaintiff introduced himself and extended his hand, Keenan refused to shake his hand and said

"there will be only one Tom in the store." (George Dep. at 91, 93.)  As a result of this incident,

plaintiff believed Keenan did not like him because they shared the same first name and Keenan

did not like his wife because her last name is Thomas.  (See George Dep. at 94-96, 102, 166,

176.)  Plaintiff testified that Keenan put a "curse" on him, which caused him to fall and fracture

his arm. (George Dep. at 156-57.)

II.      Discussion

         A.      Summary Judgment Standard

         Under Federal Rule of Civil Procedure 56(c), a moving party is entitled to summary

judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits

show that there is no genuine issue as to any material fact and that the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Gallo v. Prudential Residential

Servs., 22 F.3d 1219, 1223 (2d Cir. 1994).  The function of the court is not to resolve disputed

issues, but to determine whether there is a genuine issue to be tried.  See Anderson v. Liberty

Lobby Inc., 477 U.S. 242, 249 (1986).  In addressing a motion for summary judgment, "the court

is required to draw all factual inferences in favor of the party against whom summary judgment is

sought." Balderman v. U.S. Veterans Admin., 870 F.2d 57, 60 (2d Cir. 1989).  Summary

judgment should be granted "[o]nly when no reasonable trier of fact could find in favor of the

nonmoving party." Cruden v. Bank of N.Y., 957 F.2d 961, 975 (2d Cir. 1992).

         The moving party bears the initial burden of demonstrating that no genuine factual

dispute exists. See Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 202 (2d Cir. 1995).  If the movant

successfully shoulders its initial burden, the burden shifts to the nonmoving party to "set forth

specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250. The

non-moving party must "do more than simply show there is some metaphysical doubt as to the

material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

"[T]he mere existence of some alleged dispute between the parties will not defeat an otherwise

properly supported motion for summary judgment; the requirement is that there be no genuine

issue of material fact." Anderson, 477 U.S. at 247-48. Only when it is apparent that no rational

finder of fact "could find in favor of the non-moving party because the evidence to support its

case is so slight" should summary judgment be granted. Gallo, 22 F.2d at 1223. In addition to

viewing the facts in the light most favorable to the nonmoving party, the court liberally reviews

pro se submissions, including plaintiff's submisisons, "to raise the strongest arguments that they

suggest." Bennett v. Goord, 343 F.3d 133, 137 (2d Cir. 2003) (internal quotation marks

omitted).

     B.    Disability Discrimination Claims

     Plaintiff brings two distinct claims of discrimination in violation of the ADA. First,

plaintiff alleges that defendant discriminated against him by terminating his employment on

account of his disability. Second, plaintiff alleges that defendant discriminated against him by

failing to accommodate his disability. The ADA prohibits "discriminat[ion] against a qualified

individual on the basis of disability in regard to . . . discharge of employees, . . . and other terms,

conditions, and privileges of employment." 42 U.S.C. § 12112(a); see also Sista v. CDC Ixis N.

Am., Inc., 445 F.3d 161, 169 (2d Cir. 2006). Discrimination under the ADA includes "not

making reasonable accommodations to the known physical or mental limitations of an otherwise

8

qualified individual with a disability who is an applicant or employee." See 42 U.S.C. § 12112(b)(5)(A); 29 C.F.R. § 1630.9(a).

Claims alleging disability discrimination in violation of the ADA are subject to the burden-shifting analysis established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  McBride v. BIC Consumer Prods. Mfg. Co., 583 F.3d 92, 96 (2d Cir. 2009).  "A plaintiff must establish a prima facie case; the employer must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the discharge; and the plaintiff must then produce evidence and carry the burden of persuasion that the proferred reason is a pretext."  Sista, 445 F.3d at 169.

To establish a prima facie case of disability discrimination plaintiff must demonstrate that: 1) his employer is subject to the ADA; (2) plaintiff was a person with a disability within the meaning of the ADA; (3) plaintiff was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) plaintiff suffered adverse employment action because of the disability.  Shannon v. N .Y. City Transit Auth., 332 F.3d 95, 99 (2d Cir. 2003).

To establish a prima facie case of disability discrimination for failure to accommodate in violation of the ADA, plaintiff must demonstrate that: "1) he was an 'individual who has a disability' within the meaning of the statute; 2) the employer had notice of his disability; 3) he could perform the essential functions of the job with reasonable accommodation; and 4) the employer refused to make such accommodation."  Parker v. Columbia Pictures Indus., 204 F.3d 326, 332 (2d Cir. 2000).

Both claims asserted by plaintiff require plaintiff to show that he is a person with a disability within the meaning of the ADA.  Plaintiff has the initial burden of establishing this element.  Defendant argues that plaintiff failed to establish this essential element of his claims.

A person can demonstrate that he has a disability within the meaning of the ADA in any one of three ways.  He can show that he (A) has a physical or mental impairment that "substantially limits" one or more "major life activities"; (B) has a "record of such an impairment"; or (C) is "regarded as having such an impairment."  42 U.S.C. § 12102(1).  The parties do not dispute that plaintiff fractured his arm, but they dispute whether the effect of the impairment was substantially limiting on plaintiff's ability to perform the life activities of working and manual tasks.[1]  The court must grant summary judgment to the defendant because there is no evidence in the record from which a reasonable juror could find that plaintiff's fractured arm substantially limited his ability to work and/or perform manual tasks, that he had a record of having such an impairment, or that he was regarded as having such an impairment.  The court makes this finding while acknowledging that Congress intended the definition of disability

---

[1] "Major life activities" under the ADA are "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i).  The only major life activities implicated by plaintiff's complaint and evidence are the activities of working and performing manual tasks.  The ADA Amendments Act of 2008 ("ADAAA"), which went into effect on January 1, 2009, includes a statutory definition of "major life activities" that lists "working" and "performing manual tasks" as examples of "major life activities" and adds "lifting" to the list of functions qualifying as a major life activity.  See 42 U.S.C. § 12102(2)(A).  The ADAAA and its applicability to the instant case is discussed later in the opinion.  The court notes that because plaintiff's major life activity of working primarily entailed the activity of lifting, the decision in this case would be unaffected by a separate claim that plaintiff's impairment substantially limited his ability to perform the activity of lifting.

10

in the ADA to "be construed in favor of broad coverage of individuals." See 42 U.S.C. §

12102(4)(A).

In determining whether an impairment is "substantially limiting", the court should

"consider (1) the 'nature and severity of the impairment;' (2) the 'duration or expected duration

of the impairment;' and (3) the 'permanent or long term impact, or the expected permanent or

long term impact of or resulting from the impairment.'" Fagan v. United Intern. Ins. Co., 128 F.

Supp. 2d 182, 185 (S.D.N.Y. 2001)(citing 29 C.F.R. § 1630.2(j)(2)).  With respect to the major

life activity of working, "[t]he term 'substantially limits' means significantly restricted in the

ability to perform either a class of jobs or a broad range of jobs in various classes as compared to

the average person having comparable training, skills, and abilities.  The inability to perform a

single, particular job does not constitute a substantial limitation in the major life activity of

working." 29 C.F.R. § 1630.2(j)(3).

"Short term, temporary restrictions are not 'substantially limiting' and do not render a

person 'disabled'" under the ADA.  Levy ex rel. Levy v. Hustedt Chevrolet, No. 05-4832

(DRH)(MLO), 2008 WL 5273927, at *5 (E.D.N.Y. Dec. 17, 2008); see also Adams v. Citizens

Advice Bureau, 187 F.3d 315, 316-17 (2d Cir. 1999)(temporary neck, back, and knee injury

lasting three and a half months not a disability); Colwell v. Suffolk County Police Dep't, 158

F.3d 635, 646 (2d Cir. 1998) (temporary impairment of seven months inability to work while

recovering from a cerebral hemorrhage not substantially limiting).  Furthermore, a "transitory

impairment is not considered substantially limiting." Murray v. Sysco Corp., No.

96CV1073(RSP)(DNH), 1998 WL 160826, at *8 (N.D.N.Y. Apr. 2, 1998)(holding that a knee

injury requiring surgery did not have the required duration or long-term impact to qualify as a

11

disability under the terms of the ADA). "Intermittent, episodic impairments are not disabilities, the standard example being a broken leg. . . . A temporary or non-chronic impairment, such as a broken hip, may not be considered a 'disability' for purposes of the ADA. If the hip heals improperly, resulting in long-term difficulty in walking, the individual might then be deemed 'disabled'." Rodriguez v. DeBuono, 44 F. Supp. 2d 601, 617 (S.D.N.Y. 1999), rev'd on other grounds, 197 F.3d 611, 617 (2d Cir. 1999)(internal quotation marks and citations omitted).

Turning first to prong one of the "disability" definition and whether plaintiff has a physical impairment that "substantially limits" one or more "major life activities", see 42 U.S.C. § 12102(1)(A), the record contains evidence that plaintiff fractured his right humerus – his upper arm – and was therefore unable to work for about two months. The undisputed medical records in evidence establish that two months after plaintiff's injury, his treating physician examined his arm and prepared a note for plaintiff's employers stating that plaintiff could return to work (where he performs lifting and other manual tasks) without any restrictions. The series of five physician's notes in evidence, corresponding to a series of five doctor's visits, first finding that plaintiff could not work, then finding that he could work with restrictions, and finally finding that he could return to work without restrictions, all in a two month period, establish that plaintiff's injury was temporary and short term. Plaintiff does not deny that the physician's note he provided to T.J. Maxx prior to his April 2006 return to work put no restrictions on his work activities. Even assuming that plaintiff's treating physician approved plaintiff's return to work on April 7th solely because of plaintiff's request and not because plaintiff was in fact medically ready to return to work, each physician's note describes plaintiff's injury as a fracture of his humerus, his upper arm, and there is no indication in the record that plaintiff's injury would not

12

heal over time.  The physician's notes provide no indication that plaintiff's fractured arm had healed improperly.

Furthermore, plaintiff's deposition testimony cannot be read to support a finding that plaintiff's injury was anything but temporary.  Indeed plaintiff testified that in April 2006 he returned to his position at Pathmark, requiring him to lift heavy boxes of produce.  Plaintiff admitted that he has been able to perform his job at Pathmark since April 2006.  This admission is strong evidence that plaintiff's ability to work and perform manual tasks was not substantially limited.  Additionally, plaintiff did not identify in his February 2009 deposition testimony any permanent impairments he suffers as a result of his accident.  Plaintiff did not supplement the record with any doctors notes or medical records indicating that his fractured arm had not healed properly or resulted in any permanent limitations.

The only document in the record that could possibly indicate that plaintiff's fractured arm was not a temporary, transient injury, is the one-page decision of the New York State Workers' Compensation Board, which characterizes plaintiff's disability as a "permanent partial disability" and found that plaintiff lost 25 percent use of his right arm.  The law is clear, however, that administrative records such as Workers' Compensation awards reflecting an employee's classification as disabled for purposes other than the ADA or under other standards are insufficient for the purposes of establishing the existence of a disability under the ADA.  Crispi v. Green Bus Line, Inc., No. 00-CV-7159(NG)(RLM), 2003 WL 1903264, at *6 (E.D.N.Y. Jan. 7, 2003); see also Nickola v. Storage Tech. Corp., 160 F. App'x 658, 661 (10th Cir. 2005)("The doctors' reports and workers' compensation determination [that plaintiff sustained an eighteen percent permanent partial disability from a wrist injury], without evidence of substantial

13

limitations caused by the impairment, are insufficient to establish disability status under the ADA."); <u>Schapiro v. New York City Dep't of Health</u>, 25 F. App'x 57, 61 n.2 (2d Cir. 2001) ("While [Worker's Compensation Board findings] may establish a record of the physical impairment, they do not establish a record that the physical impairment created a substantial limitation" under the ADA.").[2] Therefore, while the New York State Workers' Compensation Board decision is evidence that plaintiff suffered an injury to his right arm, it is not evidence that this injury "substantially limits" his ability to work and/or perform manual tasks.

The record contains no evidence to support a finding that plaintiff's fractured arm resulted in a permanent long-term impairment that substantially limited any of his major life activities. Meanwhile, the fact that plaintiff has maintained his position at Pathmark without restrictions beginning two months after sustaining his injury is evidence to the contrary. Plaintiff's injury did not have the required duration or long-term impact to qualify as a disability under the terms of the ADA. Thus, the record evidence is insufficient to support an inference that plaintiff suffers from a disability under prong one of the ADA's disability definition.

For the same reasons, no reasonable juror could find on this record that plaintiff has a record of having a physical impairment that "substantially limits" his major life activity of working and/or performing manual tasks under prong two of the disability definition. <u>See</u> 42 U.S.C. § 12102(1)(B). As previously discussed, administrative records such as Workers' Compensation awards reflecting an employee's classification as disabled for purposes other than

_____

[2] The text of the ADA Amendments Act of 2008, discussed below, itself acknowledges that the standards of the ADA are different from the standards under state workers' compensation laws. <u>See</u> 42 U.S.C. § 12201(e) ("Nothing in this chapter alters the standards for determining eligibility for benefits under State worker's compensation laws or under State and Federal disability benefit programs.").

14

the ADA or under other standards are insufficient for the purposes of establishing the existence of a disability under the ADA. <u>Crispi</u>, 2003 WL 1903264, at *6.

Finally, no reasonable juror could find that plaintiff was "regarded as" having a physical impairment that "substantially limits" his major life activity of working and/or performing manual tasks under prong three of the disability definition. <u>See</u> 42 U.S.C. § 12102(2)(C). In September 2008, President Bush signed the ADA Amendments Act of 2008 ("ADAAA"), which went into effect on January 1, 2009. Pub. L. No. 110-325, 122 Stat. 3553 (codified as amended at 42 U.S.C. § 12101 et seq.). The amendments specify that the "regarded as" definition of disability under the ADA "shall not apply to impairments that are transitory and minor. A transitory impairment is an impairment with an actual or expected duration of 6 months or less." 42 U.S.C. § 12102(3)(B). Therefore, pursuant to the ADAAA, plaintiff was not regarded as having an impairment that substantially limited one or more of his major life activities, because there is no evidence in the record to support a finding that plaintiff's fractured arm would not heal within six months. In fact, the evidence in the record overwhelmingly supports the inference that plaintiff's impairment lasted only two months.

The court acknowledges that the Fifth, Sixth, Seventh, and D.C. Circuit Courts of Appeal have each held that the recent ADA amendments do not apply retroactively to govern conduct occurring before the ADAAA became effective. <u>See</u> <u>E.E.O.C. v. Agro Distrib., LLC</u>, 555 F.3d 462, 469 n.8 (5th Cir. 2009)(holding that the amendments do not apply retroactively); <u>Milholland v. Sumner County Bd. of Educ.</u>, 569 F.3d 562, 565 (6th Cir. 2009)(same); <u>Lytes v. DC Water & Sewer Auth.</u>, 572 F.3d 936, 939-42 (D.C. Cir. 2009)(same); <u>Kiesewetter v. Caterpillar Inc.</u>, 295 F. App'x 850, 851 (7th Cir. 2008)(same). But see <u>Rohr v. Salt River Project Agric. Imp. &</u>

15

Power Dist., 555 F.3d 850, 861 (9th Cir. 2009)(declining to decide whether the amendments apply retroactively); Durham v. McDonald's Rest. of Okla., Inc., 325 F. App'x 694, 695 n.2 (10th Cir. 2009)(same); Shannon v. Postmaster General of U.S. Postal Service, 335 F. App'x 21, 25 n.5 (11th Cir. 2009). The Second Circuit has not yet addressed this issue. As a whole, the ADAAA dramatically expanded the reach of the ADA by protecting individuals who are "regarded as" having a disabling impairment even when the impairment neither is, nor is perceived to be, substantially limiting. See 42 U.S.C. § 12102(3)(A)("An individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this Act because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity."). The courts that have found that the ADAAA cannot be retroactively applied have reasoned, first, that the language of the ADAAA does not include an express command that it apply retroactively and, second, the new statute would impair rights a party possessed when he acted or increase a party's liability for past conduct since it broadens the definition of "disability" and accordingly the scope of acts for which an employer may be liable under the ADA. See Lytes, 572 F.3d at 939-42; Rickert v. Midland Lutheran Coll., No. 8:07-CV-334, 2009 U.S. Dist. LEXIS 78886, *27-31 (D. Neb. Sept. 2, 2009); Rudolph v. U.S. Enrichment Corp., No. 5:08-CV-00046(TBR), 2009 U.S. Dist. LEXIS 2653, *10-14 (W.D. Ky. Jan. 15, 2009).

In this case, whether or not the ADAAA is applied, the result is the same. And, if nothing else, the ADAAA sheds light on Congress' original intent when it enacted the ADA that it not cover transitory impairments. Under the law in effect at the time plaintiff was terminated by T.J.

Maxx, there are two reasons why plaintiff was not "regarded as" disabled within the meaning of the ADA. First, the concept of "substantially limits" is the same whether the employee is proceeding under a claim that he is actually disabled or "regarded as" disabled. "Substantially limits" means that T.J. Maxx must have believed plaintiff had a condition rendering him:

> (i) Unable to perform a major life activity that the average person in the general population can perform; or (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1).  At most, T.J. Maxx management viewed plaintiff as having a broken arm, which a treating physician asserted two months after the injury was sustained did not require any limitations on plaintiff's work tasks.  This is simply not a substantially limiting impairment within the meaning of the ADA.  T.J. Maxx management may have believed that plaintiff's fractured arm would make it difficult for him to perform his job, which included manual tasks, in the short-term until the injury healed.  However, plaintiff presented no evidence to dispute that T.J. Maxx saw him as having a temporary injury without permanent or long-term impact.  See also 29 C.F.R. Pt. 1630.2(j), app. ("[T]emporary, non-chronic impairments of short duration . . . are usually not disabilities.  Such impairments may include . . . broken limbs.").

Second, under the law in effect at the time plaintiff was terminated, a person was "regarded as" disabled within the meaning of the ADA if the person did not have an impairment that met the ADA disability definition but the employer mistakenly believed that the person had an impairment that substantially limits a major life activity.  Sutton v. United Air Lines, Inc., 527 U.S. 471, 489 (1999).  When referring to the major life activity of working, the EEOC defines "substantially limits" as: "significantly restricted in the ability to perform either a class of jobs or

17

a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 C.F.R. § 1630.2(j)(3)(i). The EEOC further identifies several factors that courts should consider when determining whether an individual is substantially limited in the major life activity of working, including "the number and types of jobs utilizing similar training, knowledge, skills or abilities, within [the] geographical area [reasonably accessible to the individual], from which the individual is also disqualified." 29 C.F.R. § 1630.2(j)(3)(ii)(B). Thus, to be regarded as substantially limited in the major life activity of working, one must be regarded as precluded from more than a particular job. See 29 C.F.R. § 1630.2(j)(3)(i)("The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working"); Wernick v. Fed. Reserve Bank of N.Y., 91 F.3d 379, 383-84 (2d Cir. 1996)(quoting the text of 29 C.F.R. § 1630.2(j)(3)(i)). Viewed in the light most favorable to plaintiff, the evidence establishes that the defendant may have regarded plaintiff as temporarily unable to perform his specific job of lifting approximately 400 heavy boxes per day with his broken arm. However, the record contains no evidence from which a reasonable juror could find that T.J. Maxx management regarded plaintiff as unable to perform a class of jobs. Accordingly, under the law in effect at the time plaintiff was terminated, plaintiff was not regarded as being disabled under the ADA.

Because this court has determined that plaintiff cannot establish that he is a person with a disability within the meaning of the ADA, the court need not explore the other essential elements of his claims. Plaintiff cannot survive summary judgment on either of his claims under the ADA.

18

III.   Conclusion

For the foregoing reasons, defendant's motion for summary judgment is granted and plaintiff's complaint is dismissed.

SO ORDERED.

/S/

Allyne R. Ross
United States District Judge

Dated:  December 7, 2009
Brooklyn, New York

19

SERVICE LIST:

Pro Se Plaintiff
Thomas George
84-36 Little Neck Parkway
1st Floor
Floral Park, NY  11001


Defendant's Attorneys
Gloria Galant, Esq.
Devjani Mishra, Esq.
620 Eighth Avenue
New York, NY  10018


cc:          Magistrate Judge Lois Bloom

20